**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL INDICTMENT** |
| **v.** | **NO. 1:11-CR-462-WSD-GGB** |
| **GUADALUPE FLORES, ROBERTO BUSTOS OCAMPO, EDGAR RAMOS GONZALES, ARMANDO SOTO-ENRIQUEZ and NORMAN ISAI ALARCON-MEJIA,** | |
| **Defendants.** | |

## <u>FINAL REPORT AND RECOMMENDATION</u>

Defendants Soto-Enriquez ("Defendant Soto" or "Soto") and Alarcon-Mejia ("Defendant Mejia" or "Mejia") are charged with conspiracy and possession with the intent to distribute cocaine, in violation of 21 United States Code, Sections 846, 841(a) and 841(b). Pending before this court are Defendant Soto's Motion to Suppress Evidence and two motions to suppress identification [Docs. 80, 81, and 82]; and Defendant Mejia's Motion to Suppress Evidence and Motion to Suppress Identification [Docs. 74 and 76]. An evidentiary hearing on these motions was held before me on January 18, 2012. All transcript references are to the transcript of that hearing. My recommendations follow.

## I.  FACTS

Sometime before August 27, 2011, agents of United States Customs and Border Patrol discovered that a tractor-trailer that crossed the border from Mexico into the United States contained cocaine hidden in the trailer's shipment of frozen squid.  The tractor-trailer was headed to Atlanta.  On August 27, 2011, agents with Homeland Securities Investigations (HSI) of the United States Department of Immigration and Customs Enforcement (ICE) conducted a controlled delivery of that tractor-trailer to its destination at a warehouse in Atlanta.   (T. 3, 9-10).

After the tractor-trailer arrived at the warehouse, agents conducted constant surveillance of it in an attempt to identify the individuals who were involved with the cocaine.  (T. 11).

The warehouse is off Browns Mill Road in an industrial area behind two other buildings.  There is a long driveway off of Browns Mill Road that runs between the two other buildings and leads to the warehouse.  (T. 11, 20; Gov. Ex. 11A, 11B). The few other businesses nearby include a recycling business attached to the warehouse and a MARTA maintenance facility accessed by a different driveway. Only the MARTA maintenance facility was open on the weekends.  (T. 11, 17).  The only vehicles that the agents had ever seen pull into the driveway leading to the warehouse were vehicles going to the warehouse or vehicles carrying  employees of

AO 72A
(Rev.8/8
2)

the recycling business. (T. 17, 40). The recycling business was open standard business hours during the day. (T. 39).

From the time of the delivery on August 27, 2011, until September 3, 2011, agents conducting surveillance did not see any activity (other than their own) at the warehouse during the evening or nighttime hours. During that period of time, the smell of the rotting squid in which the cocaine was hidden could be smelled at least a quarter-mile away from the warehouse. (T, 12, 38)

On Saturday, September 3rd, Jeff DaRin, Special Agent, Homeland Security, ("Agent DaRin"), who was conducting surveillance, observed two men arrive at the warehouse, enter the part of the warehouse where the drugs were located, remain inside for approximately 20 to 30 minutes, and then leave. Agents followed their car which was eventually stopped by a Georgia State Patrol trooper for a traffic violation.[1] The driver of the car was Alfonso Alarcon-Mejia ("Alarcon") (not a defendant), and the passenger was Defendant Soto. (T. 13-15). Agent DaRin observed the stop through binoculars from about 75 yards away. He could see Soto clearly through the car's windshield. (T. 41). The trooper who made the stop told Agent DaRin that both men in the car smelled strongly of rotten squid. (T. 15).

_____

[1]Defendants do not challenge the stop of this car.

AO 72A
(Rev.8/8
2)

The next day, Sunday, September 4, 2011, agents saw three men arrive at the warehouse in a truck, go inside the warehouse, unload the cocaine from the squid, place the cocaine inside their truck, and leave. When troopers stopped the truck, agents found over 200 kilograms of cocaine inside.[2] (T. 3, 16, 45).

Later that evening, agents were at the warehouse preparing to execute a search warrant for the warehouse. Police vehicles with blue lights flashing and fire department personnel were present at the location. Agent DaRin was present with other agents to provide perimeter coverage during the execution of the search warrant. (T. 59-60, 86-7, 146).

Soon after the agents began to execute the search warrant, at about 8:30 p.m., a Nissan Altima pulled about 15 to 25 feet into the driveway leading up to the warehouse. The vehicle was turned away by fire department personnel. The vehicle stopped, backed up, turned around, and drove away down the same driveway on which it had arrived. The vehicle then pulled out onto Browns Mill Road. Agents DaRin, Ballard and Tyler followed the vehicle on to Browns Mill Road and pulled it over. The legality of this stop is the primary issue in the defendants' motions. (T. 17, 20-1, 59, 92, 142).

---

[2]Defendants do not challenge the stop of this truck.

Agent DaRin approached the Altima and recognized the driver as Defendant Soto from the previous day's traffic stop of the individuals who had entered the warehouse and smelled of rotten squid. The two passengers in the vehicle were Defendant Mejia and former Defendant Jaimes-Avila.[3] (T. 22-3).

Agent DaRin asked Defendant Soto for a driver's license. Soto produced a Mexican identification card. Agent DaRin recognized the name on the identification card as the name of the person who had been stopped the day before. (T. 22). Agent DaRin then asked Soto to step out of his vehicle, and he conducted a patdown of Soto's person. DaRin asked Soto where they were going. Soto replied that they were lost and were looking for their hotel. (T. 24-5). James Ballard, Special Agent, Homeland Security, ("Agent Ballard") read Soto his <u>Miranda</u> rights in Spanish and proceeded to question him. (T-25, 63-4).

At about the same time, other agents asked Defendant Mejia and former Defendant Jaimes-Avila to exit the vehicle. (T-26). Agents patted them down and read them their <u>Miranda</u> rights. In the search of all three men, agents found keys to two hotel rooms at the Rodeway Inn & Suites. (T-44, 90-1). They also found multiple cell phones and identification. (T. 24, 27-8, 51, 143).

---

[3]The charges against Jaimes-Avila have been dismissed. (Doc. 121)

AO 72A
(Rev.8/8
2)

In separate interviews, all three men said that they were Mexican businessmen who came to the United States to do some shopping; they had no knowledge of the cocaine in the warehouse; they did not hire anybody to go into the warehouse or do anything there; and they did not know the name of their hotel. (Tr. 47, 68).

Defendant Soto consented to a search of his vehicle. (T. 70). Agents found and inspected a GPS device that they found in the vehicle and determined that it contained the address of the Rodeway Inn, but not the address of the warehouse. Agents did not find anything in the vehicle or on Defendants' persons connecting them to the warehouse or the drugs. Defendants signed an affidavit giving the agents consent to search their hotel rooms. (T. 43-4, 46, 132).

Shortly after searching the vehicle, and about an hour and a half after it was initially stopped, Steven Ledgerwood, Special Agent, Homeland Security, ("Agent Ledgerwood") brought Hector Aguilar ("Aguilar") to the scene of the stop to see if he could identify any of the individuals in the Altima. Aguilar was a cooperating witness who had informed government agents that he could identify individuals involved with the cocaine at the warehouse. Aguilar had previously informed Agent Ledgerwood that he had attended a meeting at a hotel the night before where he was hired and paid to move the cocaine from the warehouse to another location. Aguilar

6

said that two individuals called "Poncho" and "Brito" had been at the meeting at the hotel along with other individuals. (T. 98, 100, 106-07).

Agent Ledgerwood did not say anything to Aguilar about the traffic stop, nor did he describe Soto, Mejia, or Avila, mention their names, or show Aguilar any photos. (T. 98-100). During the 10 to 15 minute drive to the scene, Agent Ledgerwood sat in the front passenger seat, Agent Owen drove, and Aguilar sat in the middle of the back seat. (T. 28, 99). The only thing Agent Ledgerwood told Aguilar on the way to the scene was that agents had some people detained and the agents wanted Aguilar to see if he could identify them. (T. 99).

As soon as Aguilar and the agents arrived on the scene, Aguilar identified the vehicle as one he had seen at the hotel the night before. He also immediately recognized one of the men standing behind the vehicle. Agent Ledgerwood told Aguilar that he needed to wait because they were going to bring up each person individually. (T. 100).

Agent Ledgerwood turned on his car's bright headlights. Agent Tyler asked Soto, Mejia, and Avila to stand individually in front of Agent Ledgerwood's car. Soto, Mejia, and Avila were not handcuffed when they stood in front of the headlights; they merely walked up, looked around, and walked back. (T. 100-02).

AO 72A
(Rev.8/8
2)

There was a clear view from inside Agent Ledgerwood's car to the men in front of the headlights. (T. 101).

Aguilar did not identify Soto, but said that he looked similar to, but was not the individual he knew as "Poncho," who had talked to him the night before about moving the cocaine. (T. 101, 107). However, Aguilar did identify Mejia and Avila as being present at the meeting at the hotel the night before when he was hired to move the drugs. The three occupants of the vehicle were then arrested and taken into custody. At that point, it had been about two hours since the time of the traffic stop. (T. 101-104, 106-108).

Around 1:30 a.m. that morning, TFO Renan Lopez and Agent Roy interviewed Soto, Mejia and Avila at HSI's office. TFO Lopez, a fluent Spanish speaker, read each defendant his <u>Miranda</u> rights in Spanish and confirmed that each man understood his rights. Each man said he wanted to speak with the agents. TFO Lopez did not make any promises or coerce any of the men to waive their rights. (T. 122, 125-6)

AO 72A
(Rev.8/8
2)

## II.    DISCUSSION

### A.    Government agents had a reasonable articulable suspicion that Defendants were engaged in criminal activity.

Defendants argue that the government agents did not have a lawful basis to stop their vehicle after they entered the driveway leading to the warehouse in which the cocaine had been stored.

It is well settled that law enforcement agents may briefly detain individuals for purposes of investigating a crime if they have a reasonable, articulable suspicion based on objective facts that the individual has engaged in, or is about to engage in, criminal activity.  See Terry v. Ohio, 392 U.S. 1, 21 (1968).  "[T]he reasonableness standard requires that a police officer be able to point to specific and articulable facts, which, when taken together with rational inferences from those facts, reasonably warrant that intrusion." United States v. Mikell, 102 F.3d 470, 474-75 (11th Cir. 1996) (citing  Terry, 392 U.S. at 21)(internal quotation marks omitted). See also United States v. Blackman, 66 F.3d 1572, 1576 (11th Cir. 1995) ("The reasonableness of the officers' conduct must be judged against an objective standard:  would the facts available to the officer at the moment of the seizure or

9

search warrant a man of reasonable caution in the belief that the action taken was appropriate.")(internal quotation marks and citations omitted).

As discussed above, before stopping the defendants' vehicle, agents knew or had a reasonable basis to believe:

- At approximately 8:30 p.m. on a Sunday night, Defendants' vehicle entered a driveway leading up to a warehouse that up until a few hours earlier had contained over 200 kilograms of cocaine hidden in a shipment of squid.

- The warehouse was in a predominantly industrial location that had little traffic. Agents had been conducting constant surveillance. The only cars agents had ever seen pulling into that driveway were cars going to the warehouse or the cars (during the day) of employees of the recycling business next door. The recycling business was closed at the time Defendants' vehicle pulled in the driveway.

The government argues that one of the circumstances justifying the stop was that the defendants fled from or evaded law enforcement. In support of that argument, the government cites United States v. Briggman, 931 F.2d 705 (11th Cir. 1991) and United States v. Gordon, 231 F.3d 750 (11th Cir. 2000). See Doc. 148, pp. 21-22. In Briggman, the court found that an officer's suspicion was reasonably

aroused when he noticed Briggman parked at 4:00 a.m. in a high crime area, when commercial establishments served by the lot were closed, and in departing the lot, he attempted to evade the officer. Id at p. 709. Similarly, in Gordon, the court relied on the fact that it was not merely presence in a high crime area, but the "affirmative and unequivocal attempt to flee upon sighting law enforcement that may support a Terry stop." 231 F.3d at n.3.

Defendants emphasize that they were turned away by fire department personnel after they drove into the driveway leading to the warehouse, and thus, there was no indication that they were "evading" law enforcement when they turned around and left the property. They then argue that they could not lawfully be stopped merely for being in a high crime area. Defendants' points are well taken; however, they are not sufficient to overcome the other factors that in totality provided reasonable suspicion for the stop of their vehicle.

To determine whether reasonable suspicion exists, courts evaluate a totality of the circumstances from the viewpoint of a reasonably well-trained officer, United States v. Smith, 201 F.3d 1317, 1323 (11th Cir. 2000), taking into account the fact that an experienced officer can infer criminal activity from conduct that may seem

innocuous to lay observers. <u>United States v. Arvizu</u>, 534 U.S. 266, 273–74, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002).

Setting aside the government's contention that the defendants evaded or fled from law enforcement, the defendants were not stopped just for being in a high crime area. The agents knew that the defendants were approaching a warehouse that just hours before had contained over 200 kilograms of cocaine that someone had attempted to conceal in a truck entering the United States from Mexico. In addition, the presence of the defendants on the driveway leading to that warehouse at 8:30 p.m. on a Sunday night was highly suspicious because the area was primarily industrial, the only other vehicles agents had ever seen in the area were going to the target location or the recycling business, and the recycling business was closed at that time. These factors, taken together, were sufficient for the agents to stop the defendants for a brief inquiry as to the reasons for their presence on the driveway leading to the warehouse that night.

**B.**     <u>**After the initial stop, there was probable cause to arrest the Defendants**</u>

Once the stop and initial inquiries were made, the defendants' presence became even more suspicious, justifying further detention of them. First, an agent immediately recognized Defendant Soto as one of the persons who had been inside

AO 72A
(Rev.8/8
2)

the warehouse the day before and smelled of rotting squid.  Second, the defendants'

story that they were lost, but did not know the name of their hotel, reasonably

increased the agents' level of  suspicion, partly because the defendants' hotel was

two or three miles away across the expressway.  (T. 53).  For all of these reasons,

the agents were justified in detaining the defendants while they conducted further

investigation of their identity, background, and connection to the cocaine in the

warehouse.

Finally, in addition to the evidence discussed above, Aguilar, a person who

had been hired to move the cocaine, identified Defendant Mejia as one of the men

present at a meeting at the hotel the night before  where the arrangements for

moving the drugs had been discussed.

Probable cause to arrest exists if the facts and circumstances within the

knowledge of the arresting agents were sufficient to warrant people of reasonable

caution to believe that the arrestee had committed a crime.  See United States v.

Long, 674 F.2d 848, 853  (11th Cir. 1982). Under the circumstances presented here,

the agents clearly had probable cause to arrest the defendants.  Cf. United States v.

Tamari, 454 F.3d 1259, 1262–64 (11th Cir.2006) (finding that there was probable

AO 72A
(Rev.8/8
2)

cause to search a vehicle of a driver who arrived at the rural, isolated scene of drug

activity driving a vehicle associated with the head of the drug conspiracy).

### C.    Defendants present no other bases for suppression of evidence

As discussed above, I have rejected Defendants' argument that the agents

unlawfully detained or arrested them.  Defendants present no other grounds for

suppression of their property, their statements, or the identification made by Aguilar.

For these reasons, all of Defendants' motions to suppress should be denied.

### III.    CONCLUSION

In sum, I **RECOMMEND** that Defendant Soto-Enriquez' Motion to Suppress

Evidence and two motions to suppress identification  [Docs. 80, 81, and 82] be

**DENIED**; and Defendant Alarcon-Mejia's Motion to Suppress Evidence and

Motion to Suppress Identification [Docs. 74 and 76] be **DENIED**.

Defendant Guadalupe Flores has entered a guilty plea; Defendants Bustos

Ocampo and Ramos Gonzales filed no motions; and Defendant Jaimes-Avila was

dismissed from the case by the government on March 20, 2012.

There are no pending matters before me, and I am aware of no problems

relating to the scheduling of this case for trial.  It is therefore **ORDERED AND**

**ADJUDGED** that this action be declared **READY FOR TRIAL**.

14

It is so **ORDERED** and **RECOMMENDED**, this __15th__ day of May, 2012.

_Gerrilyn G. Brill_

GERRILYN G. BRILL
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/8
2)